**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MARIA BONILLA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO.:** |
| | ) |
| **STRYKER CORPORATION; STRYKER** | ) |
| **SALES CORPORATION; and** | ) |
| **HOWMEDICA OSTEONICS CORP. d/b/a** | ) |
| **STRYKER ORTHOPAEDICS,** | ) |
| | ) |
| **Defendants.** | ) |

<u>**COMPLAINT AND**</u>
<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff MARIA BONILLA by and through her attorneys, COPLAN & CRANE, LTD., and MEYERS & FLOWERS, L.L.C., for her Complaint against defendants Stryker Corporation, Stryker Sales Corporation, and Howmedica Osteonics Corporation, d/b/a Stryker Orthopaedics (hereinafter referred to collectively as "Defendants"), states:

1.     This is an action for damages relating to Defendants' design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying and/or selling the defective device sold under the trade names of Stryker Rejuvenate® Modular Primary Hip System  and ABG™II[1] Modular femoral hip implant  system (hereinafter "Rejuvenate®", "ABG™ II", or "Defective Device").

<u>**PARTIES**</u>

2.     Plaintiff resides in Harvard, Illinois, and is a citizen of the State of Illinois.

3.     Defendant Stryker Corporation is a corporation organized and existing under the laws of Michigan, having its principal place of business located at 2825 Airview Boulevard,

---

[1] ABG™II Modular stands for "Anatomic Benoist Girard" II, which is the latest iteration of earlier models of monolithic femoral stems referred to as ABG™ I or ABG™ II.

Kalamazoo, Michigan 49002, and conducts business throughout the United States, including the States of West Virginia and Minnesota.

4.    Defendant Stryker Sales Corporation is a corporation organized and existing under the laws of Michigan, having its principal place of business located at 2825 Airview Boulevard, Kalamazoo, Michigan 49002, and conducts business throughout the United States, including the States of West Virginia and Minnesota.

5.    Defendant Howmedica Osteonics Corporation, d/b/a Stryker Orthopaedics, is a corporation organized and existing under the laws of New Jersey, having its principal place of business located at 325 Corporate Drive, Mahwah, New Jersey 07430, and conducts business throughout the United States, including the States of West Virginia and Minnesota.

6.    Upon information and belief, at all times mentioned in this Complaint, the employees of Defendants, their subsidiaries, affiliates, and other related entities, as well as the employees of Defendants' subsidiaries, affiliates, and other related entities, were the agents, servants and employees of Defendants, and at all times relevant to this case, were acting within the purpose and scope of their agency and employment. Whenever reference in this Complaint is made to any act or transaction by Defendants, such allegations shall be deemed to mean that Defendants' principals, officers, employees, agents, and/or representatives committed, knew of, performed, authorized, ratified, and/or directed such transactions on behalf of Defendants, and while actively engaged in the scope of their duties.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction pursuant to 28 U.S.C. §1332(a), based upon the complete diversity of the parties. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      Defendants are subject to *in personam* jurisdiction in Illinois and in this court, and venue is therefore proper here and in Illinois pursuant to 28 U.S.C. §1391, because Defendants did (and do) business within the States of Illinois and Minnesota, have had substantial, continuous, and systematic contacts with both states, have consented to jurisdiction in the States of Illinois and Minnesota, and/or committed a tort in whole or in part in the States of Illinois, Minnesota, and many other states, against thousands of Plaintiffs, including Plaintiff Maria Bonilla, as more fully described below. On information and belief, Defendants also marketed, advertised, and sold the Defective Devices in Illinois, Minnesota, and many other states, made material omissions and representations in each of these states, and breached warranties in these states.

## THE DEFECTIVE DEVICES: Rejuvenate® and ABG™ II Modular Femoral Hip Stems

9.      The hip joint connects the thigh bone (femur) of a patient's leg to the patient's pelvis. The hip joint is often characterized as a "ball and socket" joint.  The acetabulum is the cup-shaped "socket" portion of the hip, and the femoral head (the "ball") at the top of the femur rotates within the curved surface of the acetabulum—the "cup."

10.      A total hip replacement replaces the body's natural joint with an artificial one, usually made out of metal, plastic, or ceramic. A total hip replacement typically consists of four separate components: (1) a femoral stem, (2) a femoral head, (3) an acetabular liner, and (4) an acetabular shell. After the surgeon cuts off the head of the patient's femur, then hollows out a portion of the shaft of the patient's femur, the metal femoral stem is implanted. The femoral head is usually a metal or ceramic ball that is fixed on top of the femoral stem. The femoral head forms the hip joint that can rotate when it is placed inside a plastic or ceramic acetabular liner that is attached to the interior portion of the metal acetabular shell, comprised of metal on its

11.     At all times mentioned in this Complaint, Defendants developed, designed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, promoted, marketed, supplied, sold, and/or warranted the Defective Devices, either directly or indirectly, to members of the general public throughout the United States, including to Plaintiff.

12.     The Defective Devices are modular femoral hip replacement devices to be used in total hip replacement surgery.  They are indicated for patients requiring primary total hip arthroplasty due to painful joint disease of the hip resulting from non-inflammatory degenerative arthritis, including osteoarthritis and avascular necrosis.

13.     As noted, the Defective Devices are critically different from most traditional "monolithic" femoral stems used in total hip replacements because they consist of two basic components:   a cobalt-chromium neck component that is inserted into a titanium stem component.

14.     The larger portion of the femoral stem—which is actually placed down into the patient's femur—is manufactured using a proprietary titanium alloy, consisting of titanium, molybdenum, zinc and iron, given the shorthand moniker "TMZF."  This alloy was designed and patented by Defendants, and is unlike any titanium alloy employed in the manufacture of other prosthetic hip implants. The Defendants claim in their promotional materials for Rejuvenate® and ABG™ II systems that their alloy is both stronger and less rigid than other titanium alloys.

15.     The Defective Devices are not part of a single system that requires a particular acetabular component, but rather, can be used in conjunction with any number of Defendants' currently available compatible articular-bearing surface components, which comprise the femoral head and an acetabular shell.  The bearing-surface system or components are unrelated to the mode of failure now seen in the Defective Devices.

16.     As referenced above, the common feature presented in these cases is the use of a modular femoral component (*i.e.*, a two-piece femoral device) instead of a one-piece or "monolithic" device, which historically had been used for such procedures.

17.     On June 3, 2008, Defendants received FDA clearance to sell the Rejuvenate® in the United States.

18.     In February 2009, Defendants released the Rejuvenate® and said it was the latest evolution in the Company's OmniFit and Secure-Fit Hip systems.

19.     On or about November 4, 2009, Defendant received 510(k) FDA approval for the ABG™ II Modular Hip Stem as substantially equivalent to the Rejuvenate® Modular Hip Stem.

20.     The Rejuvenate® and ABG™ II Modular hips are an extension of Defendants' Stryker Modular Hip, which the FDA approved for market on September 13, 2007.

21.     Defendants refer to the  ABG™ II Modular stem  as "the natural evolution of the ABG™ II cementless stem," claiming that "it offers an 'Anatomic Reconstruction' inside the femur with its proven anatomic shape, and outside of the femur with a fine tuning of length, offset and anteversion."[2]

---

[2] ABG™ II Modular Anatomic Reconstruction brochure, © 2007, Stryker (pg. 5).

22.     According to Defendants' materials, the Defective Devices were developed to optimize anatomic restoration by providing options that offer enhanced stability, proven modularity and intra-operative flexibility.  As noted, both of the Defective Devices are comprised of separate femoral stem and neck components, and offer a variety of sizing options intra-operatively.  The benefit, according to Defendants, was that by allowing the surgeon to independently manage leg length, neck version, and femoral offset, these modular femoral components provide the ability to surgeons to customize the biomechanics of a patient's hip replacement.

23.     The Defective Devices combine the material characteristics of TMZF with a plasma sprayed coating of commercially pure Ti (Titanium) and PureFix HA (Hydroxyapatite) for the stem and CoCr (cobalt and chromium) for the neck.

24.     Defendants marketed the Defective Devices, stating, for example, with respect to the Rejuvenate® stem that "the modular junction construct is designed to maintain strength and durability. The Rejuvenate® combines the material characteristics of TMZF and cobalt chrome for the stem and neck implants, respectively.  Laboratory testing demonstrates the compatibility of these materials **without concern for fretting and corrosion**."  In other words, Defendants specifically marketed the defective devices to alleviate the concerns of doctors and patients who may have heard and learned about fretting and corrosion problems with competitors' hip implant devices.

25.     Despite Defendants' claims, this material combination has been reported to cause corrosion.  Since the 1980's, medical and scientific literature has reported corrosion to be a problem when Ti (Titanium) and CoCr (cobalt and chromium) have been used at modular junctions.

26.     The defective design and manufacture of the Defective Devices allows fretting and corrosion to occur at the Morse taper junctions between the neck and stem and neck and head.  The fretting and corrosion allows metal ions, including cobalt and chromium, to be released into the surrounding tissues.  The fretting and corrosion, and release of ions also manifest in increased cobalt and chromium levels in the patient's blood.  These cobalt and chromium ions destroy surrounding tissue and bone, often causing pseudotumors and a condition called metallosis.

27.     Defendants were aware of the problems caused by these metals in hip systems after Defendants recalled their Accolade hip system in 2009 because it caused fretting, corrosion, and tissue damage from the very metals used in the defective device at issue in this case. Defendants were also aware that these metals were dangerous in hip systems due to problems experienced and reported by other manufacturers using these metals. Nonetheless, Defendants continued to use the materials in the manufacture of the defective device, in reckless disregard for the safety of the patients like Plaintiff.

28.     Defendants recalled the Rejuvenate® and ABG™ II in July 2012, due to their defective design, manufacturing, and marketing, and the significant adverse events reported by patients and physicians using the Defective Devices.

## PLAINTIFF-SPECIFIC ALLEGATIONS

29.     On or about October 6, 2011, Plaintiff underwent left total hip replacement surgery at Mercy Harvard Hospital in Harvard, Illinois. Her surgeon, Craig C. Lyon, M.D., implanted a Defective Device. Plaintiff's Defective Device consists of the following recalled component parts: Stryker Rejuvenate® Modular Stem and Stryker Rejuvenate® Modular Neck.

30.     On or about July 15, 2013, Plaintiff underwent left total hip replacement surgery at Mercy Walworth Hospital in Lake Geneva, Wisconsin by Craig C. Lyon, M.D.   In that surgery, Dr. Lyon explanted the Defective Device he had implanted on October 6, 2011. Plaintiff's Defective Device consists of the following recalled component parts:   Stryker Rejuvenate® Modular Stem and Stryker Rejuvenate® Modular Neck.

31.     After the October 6, 2011 surgery, fretting, and corrosion from the Defective Device (between the modular cobalt-chromium neck and titanium femoral stem) proximately caused large amounts of toxic metal ions and particles to be released from the Device, which were circulating throughout Plaintiff's blood stream, organs, and soft tissue. As a result, it caused Plaintiff to suffer pain, physical damage, discomfort and inflammation in and around the soft tissue surrounding the Defective Device.

32.     The Failed left total hip arthroplasty with Stryker Rejuvenate® recalled total hip stem, along with diagnostics testing performed by Craig C. Lyons, M.D., caused Dr. Lyons to recommend that Plaintiff have the Defective Device removed in a painful, expensive, and risky left hip revision surgery on July 15, 2013 by Dr. Lyons at Mercy Walworth Hospital in Lake Geneva, Wisconsin.

33.     As a direct and proximate result of Defendants' defective design, manufacturing, and marketing of their Defective Device, Plaintiff has suffered and continues to suffer both injuries and damages, including but not limited to: past, present and future physical and mental pain and suffering; physical disability, and past, present and future medical, hospital, rehabilitative and pharmaceutical expenses, and other related damages.

34.     Revision surgeries of the femoral hip stem are more invasive and technically complex than the original hip replacement surgery, in part because the femoral stem has to

35.     Plaintiff will need many years of continuous medical treatment as a direct and proximate cause of the faulty Rejuvenate®.

36.     Plaintiff's injuries may be permanent, and they may cause additional complications in the future including revision surgeries.

37.     All of the injuries and complications suffered by Plaintiff were caused by the defective design and construction, lack of adequate warnings, and unreasonably dangerous character of the Defective Device that was implanted.  Had Defendants not concealed the known defects, the early failure rate, the known complications and the unreasonable risks associated with the use of the Defective Device, Plaintiff would not have consented to be implanted with the Defective Device.

**URGENT SAFETY NOTICES AND RECALLS**

38.     On or about April 23, 2012, less than four years after introducing the Defective Devices to market, Defendants issued an "Urgent Product Correction" letter to surgeons and hospitals in the United States regarding the Defective Devices.

39.     In this "Urgent Product Correction" letter, Defendants acknowledged that it had received reports of device failure due to heavy metal contamination. The "Urgent Product Correction" letter specifically referred to failures at the taper neck junction between the neck and stem due to corrosion and fretting.

40.     This corrosion and fretting was exactly the same failure mechanism that Defendants had marketed and warranted would not occur because of the Defective Devices' design and composition. This was also exactly the same failure mechanism that the medical and scientific community had been studying and documenting in modular device design since the 1980s.

41.     In the "Urgent Product Correction" letter, Defendants described symptoms and findings identical to those experienced by Plaintiff.

42.     Among those symptoms and findings specifically mentioned in the "Urgent Product Correction" letter were tissue necrosis, metallosis, adverse soft tissue reaction, and pseudotumor formation.

43.     Almost immediately after Defendants issued the "Urgent Product Correction" letter, on or about May 28, 2012, Defendants issued a voluntary recall of the Rejuvenate® and ABG™ II in Canada. In the Canadian recall notice, Defendants stated that they were amending the Instructions for Use for the defective devices to include warnings that Defendants were on notice of the issues described in the "Urgent Product Correction" above, and a hazard about which Defendants had already been on notice.

44.     Finally, as noted, on July 6, 2012, Defendants issued a Press Release voluntary recalling all Rejuvenate® and ABG™ II stems in the United States, effectively removing the Defective Devices from the market and terminating global distribution. As part of the July 2012 Recall Notice, Defendants once again cited reports of device failure due to heavy metal fretting and corrosion causing an increased likelihood for adverse local tissue reaction.

45.     The FDA classified Defendants' actions as a Class II Recall affecting nearly 53,000 Defective Devices, believed to have been implanted in thousands of patients.

46.     Defendants' initial response in the April 26, 2012 letter was to downplay the significance of adverse outcomes stating that revision surgeries were only necessary in less than one percent of the patients. That posture has changed significantly.

47.     On January 3, 2013, Defendants sent an "Urgent Update Product Recall" letter to surgeons and hospitals updating corrective actions for patients. This letter encouraged examinations and testing even if the patient is thus far asymptomatic. Furthermore, Defendants instructed surgeons to conduct follow-up examinations at regular intervals, even in the event that initial findings appear normal.

## THE FEDERAL REQUIREMENTS

48.     Federal regulations state: "Recall means a firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it administers and against which the agency would initiate legal action, *e.g.* seizure." See 21 CFR §7.3(g).

49.     Federal regulations state, "Recall classification means the numerical designation, *i.e.*, I, II or III, assigned by the Food and Drug Administration to a particular product recall to indicate the relative degree of health hazard presented by the product being recalled." See 21 CFR §7.3(m).

50.     Federal regulations further state "Class II is a situation in which use of, or exposure to, a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote." See 21 CFR §7.3(m).

51.     The classification of the product withdrawals and corrections of the Defendants' Defective Devices (described above) as Class II Recalls by the FDA confirms by definition that

52.     Pursuant to federal law, a device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements.  See 21 U.S.C. §351.

53.     Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular manner, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof.  See 21 U.S.C. §352.

54.     Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices.  In particular, manufacturers must keep records and make reports if any of its medical devices may have caused or contributed to death or serious injury, or if the devices have malfunctioned in a manner likely to cause or contribute to death or serious injury.  Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health.  See 21 U.S.C. §360 (i).

55.     Pursuant to FDA regulation, adverse events associated with a medical device must be reported to FDA within thirty (30) days after the manufacturer becomes aware that a device may have caused or contributed to death or serious injury, or that a device has malfunctioned and

56.     Pursuant to federal regulations, manufacturers of medical devices must also describe in every individual adverse event report whether remedial action was taken with regard to the adverse event, and whether the remedial action was reported to FDA as a removal or correction of the device.  See 21 CFR §803.52.

57.     Pursuant to federal regulations, manufacturers of medical devices must also report to FDA in five (5) business days after becoming aware of any reportable MDR (Medical Device Reporting) event or events, including a trend analysis that necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.  See 21 CFR §803.53.

58.     Pursuant to federal regulation, device manufacturers must report promptly to FDA any device corrections and removals, and maintain records of device corrections and removals. FDA regulations require submission of a written report within ten working days of any correction or removal of a device initiated by the manufacturer to reduce a risk to health posed by the device, or to remedy a violation of the Act caused by the device, which may present a risk to health.  The written submission must contain, among other things, a description of the event giving rise to the information reported and the corrective or removal actions taken, and any illness or injuries that have occurred with use of the device, including reference to any device report numbers.  Manufacturers must also indicate the total number of devices manufactured or

59.     Pursuant to federal regulation, manufacturers must comply with specific quality system requirements promulgated by FDA.  These regulations require manufacturers to meet design control requirements, including but not limited to conducting design validation to ensure that devices conform to defined user needs and intended uses.  Manufacturers must also meet quality standards in manufacture and production of the devices.  Manufacturers must establish and maintain procedures for implementing corrective actions and preventive actions, and investigate the cause of nonconforming products and take corrective action to prevent recurrence.  Manufacturers are also required to review and evaluate all complaints and determine whether an investigation is necessary.  Manufacturers are also required to use statistical techniques, where necessary, to evaluate product performance.  See 21 CFR §820.

60.     Pursuant to federal regulation, a manufacturer must report to the FDA any new indications for use of a device, labeling changes, or changes in the performance or design specifications, circuits, components, ingredients, principle of operation or physical layout of the device.  Federal regulations require that "A PMA (Premarket Approval) supplement must be submitted when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device failures necessitate a labeling, manufacturing, or device modification."

61.     Specifically, it is believed that with respect to the Defective Devices, Defendants failed to timely report adverse events; failed to timely conduct failure investigations and analysis; failed to timely report any and all information concerning product failures and corrections; failed to timely and fully inform FDA of unanticipated adverse effects, increases in the incidence of adverse effects, or device failures necessitating a labeling, manufacturing or

<u>**COUNT ONE**</u>
<u>**STRICT PRODUCTS LIABILITY: MANUFACTURING DEFECT**</u>

62.    Plaintiff adopts and incorporates by reference all the previous allegations of her Complaint as if fully set forth here, and further states:

63.    At all times material hereto, the Defendants were the manufacturer, distributor, seller, and/or supplier of one or more defective components used in Plaintiff's body.

64.    The Defective Devices or components manufactured, sold, distributed, supplied, and/or placed in the stream of commerce by the Defendants were defective in manufacture and construction when they left the hands of the Defendants, in that they deviated from product specifications and/or applicable federal requirements for these medical devices, and posed a serious risk of injury and/or death.

65.    Defendants knew or reasonably should have known that the Defective Device, as manufactured or constructed, was defective and posed an unreasonable risk of harm to individuals, including Plaintiff, who used the Defective Device as intended by Defendants.

66.    As a direct and proximate result of the defective manufacture or construction of the Defendants' Defective Devices and Plaintiff's use of the Defective Device as manufactured, sold, supplied, and introduced into the stream of commerce by Defendants and/or the Defendants' failure to comply with federal requirements, Plaintiff suffered serious and permanent physical injury, harm, damages and economic loss as described above and will continue to suffer such harm, damages and economic loss in the future.

67.     Plaintiff contends that the conduct of the Defendants is attended by circumstances of fraud, malice, or willful and wanton conduct, and constitutes a flagrant or reckless disregard for human life so as to warrant the imposition of exemplary damages.

## COUNT TWO
## STRICT PRODUCTS LIABILITY:  DESIGN DEFECT

68.     Plaintiff adopts and incorporates by reference all the previous allegations of her Complaint as if fully set forth here, and further states:

69.     The Defective Devices or components, as manufactured and supplied by Defendants, were defective in design and formulation in that when they left the hands of the Defendants, the foreseeable risks of the product exceeded the benefits associated with its design or formulation, or it was more dangerous than an ordinary customer would expect and/or failed to comply with federal requirements for these medical devices.

70.     The foreseeable risks associated with the design or formulation of the Defective Devices includes, but is not limited to, the fact that the design or formulation of the Defective Devices is more dangerous than a reasonably prudent consumer would expect when used in its intended manner and/or it failed to comply with federal requirements. The defective design allows fretting and corrosion of metals at the Morse taper junctions as described above. This defective design causes the very condition that Defendants marketed and warranted would not occur.

71.     As a direct and proximate result of the defective design of the Defendants' Defective Devices or components and Plaintiff's use of the Defective Device as designed, manufactured, sold, supplied, and introduced into the stream of commerce by Defendants and/or the Defendants' failure to comply with federal requirements, Plaintiff suffered serious permanent

72.     Plaintiff contends that the conduct of the Defendants is attended by circumstances of fraud, malice, or willful and wanton conduct, and constitutes a flagrant and reckless disregard for human life so as to warrant the imposition of exemplary damages.

**COUNT THREE**
**STRICT PRODUCTS LIABILITY:  FAILURE TO WARN**

73.     Plaintiff adopts and incorporates by reference all the previous allegations of her Complaint as if fully set forth here, and further states:

74.     At all times material hereto, Defendants were the manufacturer, designer, distributor, seller, and/or supplier of the Defective Devices or components, and sold the Defective Devices to patients knowing they would then be implanted in patients in need of a hip prosthesis.

75.     The Defective Device or component was expected to, and did, reach the Plaintiff without substantial change or adjustment in its condition as designed, manufactured, and sold by the Defendants.

76.     The Defective Device as designed, developed, tested, manufactured, marketed, sold, and/or placed in the stream of commerce by Defendants was in a dangerous and defective condition when it left the hands of the Defendants, and posed a threat to any user of the device.

77.     Plaintiff was and is in the class of persons that Defendants actually considered, or should have considered, to be subject to the harm caused by the defective nature of the Defective Device.

78.     The Defective Device or components were implanted and used in the manner for which the Defective Device or components were intended.  Plaintiff's use of the Defective

79.     Defendants knew or should have known that the Defective Devices as designed, developed, tested, manufactured, marketed, sold, and/or placed in the stream of commerce by Defendants was in a dangerous and defective condition when it left the hands of the Defendants, and posed a threat to any user of the device.

80.     Defendants failed to provide adequate and timely warnings or instructions regarding the Defective Device and its known defects.

81.     As a direct and proximate result of the Defendants' failure to warn Plaintiff of the dangerous condition of the Defective Device, and Plaintiff's use of the Defective Device as designed, manufactured, sold, supplied, and introduced into the stream of commerce by Defendants and/or the Defendants' failure to comply with federal requirements, Plaintiff suffered serious permanent physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

82.     Plaintiff contends that the conduct of the Defendants is attended by circumstances of fraud, malice, or willful and wanton conduct, and constitutes a flagrant and reckless disregard for human life so as to warrant the imposition of exemplary damages.

## COUNT FOUR
## NEGLIGENCE

83.     Plaintiff adopts and incorporates by reference all the previous allegations of her Complaint as if fully set forth here, and further states:

84.     Defendants designed, manufactured, marketed, detailed, and advertised the Defective Devices, both to physicians and consumers.

85. As a result, Defendants had a duty to perform each of these functions reasonably and with reasonable and due care for the safety and well-being of patients in whom the devices would be implanted.

86. Defendants failed to use reasonable and due care for the safety and well-being of those in whom the Defective Devices would be implanted and is, therefore, negligent in the following respects:

    a. Defendants failed to adequately design and manufacture the Defective Devices to insure they would not corrode, erode, deteriorate fret, and induce severe metal toxicity in the patient. The flaws include, but are not limited to, the following:

        i. The incompatibility of the TMZF titanium alloy with other components;

        ii. Poor design of the taper neck junction between stem and neck such that micro motion was predictable;

        iii. Poor manufacturing practices such that the taper neck junction between the neck and stem do not "fit" the way they were intended; and,

        iv. A combination of the above factors leads to fretting, rapid, severe heavy metal cast off, and corrosion, causing soft tissue and bony necrosis, pain and premature failure of the Rejuvenate® and/or ABG™ Components.

    b. Defendants failed to adequately test the Defective Devices to insure they would not corrode, erode, deteriorate, fret and/or induce severe metal toxicity in the patient;

    c. Defendants failed to conduct anything other than bench testing so that when manufactured, marketed, and implanted, patients became, in essence, Defendant's first clinical trial;

    d. Defendants made affirmative representations that the Defective Devices would not fret or corrode in the human body. These representations were false and misleading to both physicians and the consumer, including Plaintiff;

e. Defendants trained its sales force to "detail" the Defective Devices utilizing representations that the Defendants knew or should have known were false, creating in the minds of both surgeons and consumers that the device would not cause metal toxicity;

f. Defendants specifically marketed the Defective Devices as a safe alternative to metal-on-metal bearing surface devices that had been widely publicized as capable of causing premature failure due to heavy metal toxicity;

g. Defendants marketed the Defective Devices as a "perfect fit" for younger patients due to its modular design, creating in the minds of physicians and consumers that the Defective Devices were superior to other available hip implants when, in fact, the Defective Devices were so poorly designed, constructed, and tested that they had to be recalled from the market approximately three years after they were introduced;

h. Defendants failed to manufacture the Defective Devices to Defendants' own internal specifications such that the taper neck junction between the neck and stem prematurely failed causing metal debris cast-off and severe metal toxicity in patients;

i. Defendants failed to adequately test the TMZF alloy's compatibility with chrome cobalt components in an effort to prevent corrosion and fretting at the neck/stem taper neck junction of this modular hip replacement device;

j. Defendants failed to promptly act upon reports of early failure such that the Defective Devices continued to be implanted in unknowing patients by surgeons well after it should have been recalled or sales suspended;

k. Upon information and belief, Defendants chose, as its predicate device, a system that had known disastrous failures, had to be redesigned due to design flaws, and has been the subject of protracted litigation filed by patients who have been harmed by defects in the predicate modular devices; and,

l. Defendants were on actual knowledge before marketing the Defective Devices that their TMZF titanium alloy performed poorly when mated with its chrome cobalt components. Defendants also knew when they introduced the Defective Devices to the market that the Stryker Accolade, as well as other Stryker devices that were also of TMZF alloy, were experiencing corrosion, fretting, and failure issues at the taper neck junction between the neck and chrome cobalt head or ball. Nevertheless, Defendants either suppressed or ignored the reports, and marketed the Defective Devices anyway, knowing that these two dissimilar metals were performing poorly in the market.

87.     The above conduct illustrates Defendants' failure to exercise reasonable and appropriate care. It was foreseeable that such negligence would lead to premature device failure, as well as severe, permanent, debilitating injury to patients, including Plaintiff.

88.     As a direct and proximate result of the Defendants' negligence, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

89.     In performing the foregoing acts and omissions, Defendants acted grossly negligent, fraudulently, and with malice so as to justify an award of punitive and/or exemplary damages.

## COUNT FIVE
## NEGLIGENCE *PER SE*

90.     Plaintiff adopts and incorporates by reference all the previous allegations of her Complaint as if fully set forth here, and further states:

91.     Defendants have an obligation to not violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warnings of the risks and dangers of the Defective Devices, and otherwise distributing the Defective Device.

92.     Defendants' acts and omissions constitute an adulteration, misbranding, or both, as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§331(a) and 333(a)(2), and constitute a breach of duty subjecting Defendants to civil liability for all damages arising therefrom, under theories of negligence *per se*.

21

93.     Plaintiff, as a purchaser of the Defective Device, is within the class of persons the statutes and regulations (described above) are designed to protect, and Plaintiff's injuries are the type of harm these statutes and regulations are designed to prevent.

94.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which she is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

## COUNT SIX
## BREACH OF WARRANTIES

95.     Plaintiff adopts and incorporates by reference all the previous allegations of her Complaint as if fully set forth here, and further states:

96.     Plaintiff reserves the right to present evidence in support of the claim which is not presently in Plaintiff's possession, but which is not necessarily limited to: instruction for use manuals; all written material or information provided on and/or within any and all packaging associated with Plaintiff's Defective Device; manufacturer's labels, package inserts; Adverse Event Reports; clinical trial data; and medical data.

97.     Plaintiff, by and through Plaintiff's implanting orthopedic surgeon, used the Defective Device for its intended purpose.

98.     Contrary to the express and implied warranties, at the time the Defendants marketed, sold and/or distributed the Defective Device, it was not of merchantable quality or safe for their intended use as described above.

99.     As a direct and proximate result of one or more of the foregoing wrongful acts or omissions in and by the Defendants, the Defective Device caused Plaintiff to suffer and sustain injuries of a permanent nature; Plaintiff was caused to, and will in the future be caused to, endure

WHEREFORE, Plaintiff prays for judgment against Defendants in a sum in excess of jurisdictional limits of this Court, together with interests and costs of this action.

## COUNT SEVEN
## NEGLIGENT MISREPRESENTATION

100.     Plaintiff adopts and incorporates by reference all the previous allegations of her Complaint as if fully set forth here, and further states:

101.     When Defendants manufactured, designed, marketed, sold and distributed the Defective Device for use by Plaintiff, Defendants knew or should have known of the use for which the Defective Devices were intended, and the serious risks and dangers associated with such use of the Defective Devices.

102.     Defendants owed a duty to treating physicians and to the ultimate end-users of the Defective Devices, including Plaintiff, to accurately and truthfully represent the risks of the Defective Devices.   Defendants breached that duty by misrepresenting and/or failing to adequately warn Plaintiff's physicians, the medical community, Plaintiff, and the public about the risks of the Defective Device, which Defendants knew or in the exercise of diligence should have known.

103.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which she is entitled to compensatory damages in an amount to be proven at trial.

## COUNT EIGHT
## PUNITIVE DAMAGES

104.    Plaintiff adopts and incorporates by reference all the previous allegations of her Complaint as if fully set forth here, and further states:

105.    At the time Defendants manufactured, designed, marketed, sold and distributed the Defective Device for use by Plaintiff, Defendants knew or should have known of the use for which the Defective Devices were intended and the serious risks and dangers associated with such use of the Defective Devices.

106.    Defendants owed a duty to treating physicians and to the ultimate end-users of the Defective Devices, including Plaintiff, to accurately and truthfully represent the risks of the Defective Devices. Defendants breached that duty by misrepresenting and/or failing to adequately warn Plaintiff's physicians, the medical community, Plaintiff, and the public about the risks of the Defective Device, which Defendants knew or in the exercise of diligence should have known.

107.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which he is entitled to compensatory damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against the Defendants as follows:

a.  For an award of compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00);

b.  For an award of punitive or exemplary damages against Defendants;

c.  For reasonable attorney fees and costs;

    d.   For pre-judgment interest; and

    e.   For such further and other relief this Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: October 2, 2013                          Respectfully submitted,

                                               **Meyers & Flowers, L.L.C.**

                                               /s/ Peter J. Flowers

Peter J. Flowers (IL #06210847)
Sean M. Hendricks (IL #6300007)
Meyers & Flowers
3 North Second Street, Suite 300
St. Charles, Illinois 60174
Phone: (630) 232-6333
Fax: (630) 845-8982
Email: pjf@meyers-flowers.com
Email: smh@meyers-flowers.com


Gregory F. Coplan (IL #6210576)
Ben Crane (IL #6210576)
Coplan & Crane, Ltd.
1111 Westgate Street
Oak Park, Illinois 60301-1007
(708) 358-8080
Email: gcoplan@colplancrane.com
Email: bcrane@coplancrane.com


*Attorneys for Plaintiff*

**<u>PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL AS FOLLOWS:</u>**

Stryker Corporation
2825 Airview Boulevard
Portage, Michigan  49002

Stryker Sales Corporation
2825 Airview Boulevard
Kalamazoo, Michigan 49002

Howmedica Osteonics Corporation
325 Corporate Drive
Mahwah, New Jersey 07430